IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| LUCINNE VENEGAS, Individually, on Behalf of the Estate of Carlos Javier Venegas and on Behalf of Her Minor Children, D.V., G.V., and M.V., <br><br> *Plaintiff,* <br><br> vs. <br><br> SPACE EXPLORATION TECHNOLOGIES CORPORATION and DOGLEG PARK, LLC, <br><br> *Defendants.* | § § § § § § § § § § § § § § § § | Civil Action No. 1-21-CV-54 |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff LUCINNE VENEGAS, Individually, on Behalf of the Estate of Carlos Javier Venegas, and on Behalf of Her Minor Children, D.V., G.V., and M.V., files this First Amended Complaint against Defendants SPACE EXPLORATION TECHNOLOGIES CORPORATION and DOGLEG PARK, LLC (collectively "Defendants"), and in support of her causes of action, respectfully show this Honorable Court the following:

## I.
## SUMMARY OF THE CASE

1. This case is about holding SpaceX responsible for the gruesome death of Mrs. Venegas's husband, Mr. Venegas. In June 2020, SpaceX failed to maintain safe access points to its SpaceX facility, resulting in the Venegas family crashing into a delivery truck stalled at the entrance to SpaceX in the dark of night because it could not reasonably access SpaceX's narrow entrance to its facilities.

**EXHIBIT A**

## II.
## PARTIES

2. Plaintiff **Lucinne Venegas** ("Mrs. Venegas") is an individual, residing in Cameron County, Texas. She is the surviving wife of decedent Mr. Carlos Venegas ("Mr. Venegas") and mother to their three minor children. Mrs. Venegas brings this case on behalf of herself, her husband's estate and her minor children.

3. Defendant **Space Exploration Technologies Corporation** is a corporation conducting business in Texas and maintains several principal offices in Texas at 54298 Boca Chica Blvd., Brownsville, Texas and 1 Rocket Road, Brownsville, Texas. It owns and/or purchased the property where the injury occurred. It has appeared by counsel in this matter and may be served in accordance with the Federal Rules of Civil Procedure.

4. Defendant **Dogleg Park, LLC** is a limited liability company conducting business in Texas and maintains a principal office at 1 Rocket Road, Brownsville, Texas. It owns and/or purchased the property where the injury occurred. It has appeared by counsel in this matter and may be served in accordance with the Federal Rules of Civil Procedure.

## III.
## FACTUAL BACKGROUND

A. Introduction to the Parties.

5. Mr. Venegas was a thirty-five-year-old resident of San Benito, Texas, directly outside Brownsville, Texas. He was married to Plaintiff Lucinne Venegas. Together, they have three minor children, ages fourteen, eleven, and two. They reside in Cameron County.

6. Defendants Space Exploration Technologies Corp. and Dogleg Park, LLC own the property in and around where the incident described herein occurred. This property houses the Defendants' SpaceX operations in Texas, including the location where SpaceX launches its Falcon rocket systems into outer space.

**EXHIBIT A**

**B. Defendants purchased significant land in Boca Chica, Texas but utterly failed to update its property to accommodate its massive, commercial enterprises and round-the-clock commercial deliveries.**

7. Boca Chica, Texas is a small, unincorporated community of about forty houses, mostly one-story homes on the southernmost tip of Texas. Boca Chica has no shops or restaurants or amenities of any kind, including any municipal water pipes. Cameron County regularly trucks in gallons of water, which is stored in outdoor tanks.

8. The only way to reach Boca Chica village is via State Highway 4, a two-lane road that runs through mostly empty land. It originates to the west, in the city of Brownsville, and disappears into the shores of Boca Chica Beach, an eight-mile stretch of unspoiled sand, free of boardwalks and souvenir shops.[1]

9. In and around 2012, Defendants began buying up property in and around Boca Chica, Texas for the purpose of constructing a massive enterprise centered around flying cargo for NASA to the International Space Station. Defendants represented on numerous occasions that they intended to build "a commercial Cape Canaveral" in and around Boca Chica, Texas to launch as a many as twelve Falcon 9 rockets per year. Boca Chica, Texas was chosen as Defendants' top choice in part given its close proximity to the planet's equator, which spins faster than the poles, providing departing rockets with an extra boost.

10. Defendants promised Boca Chica residents that their presence would be safe and state-of-the-art. Defendants claimed SpaceX would bring significant revenue, jobs and economic advantages to the region. Defendants further promised to invest heavily into the local community and ensure that the community's infrastructure could safely operate and maintain the enormous commercial construction and enterprise undertaken at the SpaceX facilities.

---

[1] See https://www.theatlantic.com/science/archive/2020/02/space-x-texas-village-boca-chica/606382/

**EXHIBIT A**

11. Defendants control and operate a single lane access point on LBJ Boulevard. This street is the access point to the SpaceX's launch control centers. LBJ Boulevard connects directly to State Highway 4, which runs parallel to the beach. The incident involved occurred at the intersection of State Highway 4 and LBJ Boulevard (herein after referred to as "the Site" or "access point"). The small access point is depicted here facing west in June 2019 before SpaceX began operations:



And facing East:



**EXHIBIT A**

12. But construction exploded between June 2019 and July 2020:



A June 2020 aerial shot of the SpaceX control center at Boca Chica Village. Courtesy: RGV Aerial Photography. [2]



[3]

---

[2] Photo in June 2020 from https://www.virtualbx.com/construction-preview/brownsville-space-tourist-resort-in-the-works-at-spacex-boca-chica/

[3] Photo in July 2020 from https://twitter.com/RGVaerialphotos/status/128390706184005226/photo/2

**EXHIBIT A**

13. Before Defendants' massive construction, the site experienced virtually no traffic at night other than local residents coming from and going to the beach nearby. Before Defendants' arrival, the location did not require lighting, signs, a traffic light, or safety systems to monitor and direct traffic safely. The area surrounding the Site was quiet and frequently used by Brownsville-area residents as a popular camping area.

14. When SpaceX began its massive commercial and industrial construction and operations in 2019 and 2020, the Site experienced a massive uptick in traffic around-the-clock by eighteen-wheelers and flat-bed haulers.

15. SpaceX hired SOS Security, LLC and tasked this private security company with patrolling its facilities and State Highway 4 and surrounding public streets that are adjacent to its Boca Chica facilities, including its control center and launch pad a short distance away. SpaceX's security force oversaw and supervised SOS Security's personnel.

16. SOS Security was tasked with responding to any and all accidents, disturbances, and security threats around SpaceX's facilities, including those occurring on state and local roads. SpaceX also tasked SOS Security with monitoring and directing traffic and communicating with delivery drivers regularly on State Highway 4. As mentioned above, deliveries to SpaceX's facilities occurred around-the-clock, with SpaceX's internal security personnel and SOS Security personnel tasked with monitoring and controlling this traffic. SpaceX also hired off-duty officers with the Cameron County Sheriff's Department to support SOS Security personnel and patrol State Highway 4 and local streets as private security for SpaceX.

17. In 2019, SpaceX began treating State Highway 4 and the adjoining streets owned by Cameron County and the State of Texas as its own private roads. In fact, at one point, SpaceX renamed an adjoining street owned by Cameron County as "Rocket Road." SpaceX's security

**EXHIBIT A**

personal and SOS Security personnel patrolled the public and private streets around SpaceX's facilities on hourly patrols.

18. Throughout 2019, trucks making deliveries to SpaceX's facilities would park along State Highway 4 in long lines leading up to the Site daily on both sides of State Highway 4 waiting to drop off their loads. SOS Security would assist these drivers on parking, re-locating, and delivering their goods. When heavy equipment and/or machinery was delivered, SOS Security—on SpaceX's behalf and on SpaceX's orders—would provide an escort along State Highway 4 to SpaceX's facilities.

19. Despite Defendants' systematic, commercial use of State Highway 4 and this narrow, one-lane access point at the Site, Defendants refused to take any necessary steps to upgrade and modernize this access point to accommodate the commercial deliveries coming from and going at all hours of the day.

20. Defendants installed no lights, street signs, cones, reflective warnings, or any other necessary safety systems to notify local residents of incoming or outgoing commercial traffic. They installed no security or safety systems or guards to monitor and direct traffic. They made no attempts to widen the access point at the Site to accommodate larger, commercial vehicles. They implemented no policies or procedures or provided no instructions to third-party companies delivering commercial loads to or from the Site in darkness in the middle of the night.

21. Thus, while State Highway 4 and its adjoining streets around SpaceX's Boca Chica facilities may be "public" in name and ownership, they are not treated as public in-use. SpaceX treats these roads as a part of their facilities and uses them as an extension of their commercial operations.

22. This is an unincorporated community. The government had no obligation to install such safety measures on Defendants' behalf and for Defendants' benefit. This was Defendants'

**EXHIBIT A**

responsibility given the unsafe conditions it created in and around its property. This was their operation and commercial enterprise.

23. The unsafe conditions above created a danger to local beach-goers because it was reasonable and foreseeable that local residents would not be able to safely navigate the Site at night without any warnings, signs, lights, or safety systems to notify them that commercial vehicles were attempting to access the Site.

24. Furthermore, the Site was unprepared and unqualified to support large commercial vehicles around-the-clock in the dark at night because it was too narrow to accommodate large commercial vehicles. The unsafe, narrow conditions of the Site caused commercial vehicles great difficulty in accessing the Site at night and frequently forced them to block State Highway 4 for considerable time in an attempt to back into or pull through the access point near the Site.

25. In other words, it was reasonable and foreseeable that commercial trucks would only be able to access the Site with great difficulty in utter darkness at night, and the conditions of the Site may force a driver to back up repeatedly in order to access the street. Put plainly, the Site—which originally accommodated only a few local beach-goers—was completely unprepared to safely accommodate the large, commercial traffic at all hours of the day and to ensure the safety of local, beach-goers.

26. But this was no accident. Defendants are multi-billion-dollar corporations owned and operated by some of America's most successful minds. It is inconceivable that Defendants are qualified to fly rocket ships to the International Space Station but cannot adequately outfit the access points in and around their "Cape-Canaveral-like" enterprise.

27. Even more alarming, SOS Security personnel notified SpaceX that the conditions around the access point and on State Highway 4 were unsafe. But SpaceX security coordinator Chase Gunner literally told SOS Security personnel to "shut up about it."

**EXHIBIT A**

28. This was about profits and timing. It was not about safety. Defendants were determined to rush construction and open operations of its massive enterprise in Boca Chica, and it ultimately caused and contributed to the death of Mr. Venegas.

**C. On June 7, 2020, Mr. Venegas is killed when the Venegas family crashed into a truck attempting to navigate this access point in complete darkness.**

29. On the morning of June 7, 2020, Mr. Venegas, his wife, and three children were camping at the campgrounds directly off State Highway 4 near the Site. Around 4:00 a.m., the tide at the beach began to rise. This forced the Venegas family to vacate their camping site and return home.

30. While driving down State Highway 4 in utter darkness, unbeknownst to them, an eighteen-wheeler commercial truck was delivering product to and from Defendants' facilities in the middle of the night. In doing so, the truck driver attempted to access the Site. But due to the lack of lighting and conditions of the access point, he was unable to access the Site without difficulty.

31. This forced the driver of the eighteen-wheeler to back up unsafely and stop in the middle of the road. Without any reflective signage, lighting of any kind, warning markers, reflective markers, stop lights, stop signs, cones, security personnel, or safety systems, the Venegas family could not see the truck at all.

32. At approximately 4:16 a.m., the Venegas family crashing into the eighteen-wheeler's trailer. The police report depicts the location of the vehicles:

**EXHIBIT A**



33. Mr. Venegas's head was smashed in by the collision, causing massive hemorrhaging followed shortly by death. Ms. Venegas and her children likewise suffered serious injuries to their spines and legs. This photo depicts the crash and dark conditions:



**EXHIBIT A**

34. The autopsy report for Mr. Venegas determined the following cause of death:

**CAUSE OF DEATH:** Blunt Force Trauma due to Motor Vehicle Accident.

**MANNER OF DEATH:** Accident.

35. The driver of the truck that caused the crash told SOS Security he was unable to back-up because it was too dark to see where he was going.

36. But this was no accident. Mr. Venegas's senseless death could have been avoided had Defendants taken specific steps to ensure that deliveries occurred safely and the access points in and around their facilities were safe and navigable by large commercial vehicles, accessing their facilities in the middle of the night. Mrs. Venegas brings this lawsuit to recover damages caused by Defendants' conduct and to ensure this tragedy never happens again.

## IV.
## CAUSES OF ACTION

**A. Negligence /Gross Negligence**

37. Plaintiff incorporates the above paragraphs as if set forth in full below.

38. Defendants owed the Venegas family a reasonable duty of care, including the duty to reduce or eliminate numerous risks on or at the entry of their property, either by warning the Venegas family of the unsafe conditions so they could be avoided or guarded against or by implementing training, policies or procedures to avoid the unsafe conditions.

39. These actions, when viewed objectively from Defendants' standpoint at the time of the incident, involved an extreme degree of risk, of which Defendants had actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of the Venegas family.

**EXHIBIT A**

40. On the occasion in question, the aforementioned Defendants, by and through its officers, employees, agents and representatives, committed acts of omission and commission, breached their duty of care owed to the Venegas family, which collectively and severally constituted negligence and gross negligence. This includes but is not limited to:

- failing to take reasonable steps to widen the access point near the Site;
- failing to install lights at the Site;
- failing to install signs/warnings at the Site;
- failing to install reflective lights near the Site;
- failing to maintain safe access points to its property;
- failing to install and/or implement security to direct traffic and/or assist in dangerous conditions;
- ordering and/or allowing third party suppliers and/or companies to deliver products when it was unsafe to do so;
- ordering and/or allowing third party suppliers and/or companies to deliver products in the middle of the night;
- failing to take precautions to ensure that third parties could safely access its property at night;
- implementing policies and procedures that were unsafe;
- failing to protect beach-goers from unsafe hazards around the property;
- failing to ensure a comprehensive job safety analysis was completed that identified and addressed all hazards;
- ignoring safety precautions or recommendations to install safety systems in and around the property;
- failing to warn of a known hazard;
- failing to follow industry standards, guidelines and requirements for operating and maintain access points to large commercial facilities;
- promulgating policies and procedures that were inadequate and unsafe;
- misrepresenting that Defendants' property would be safe;

**EXHIBIT A**

- misrepresenting that Defendants would take action to upgrade the property and infrastructure in and around their property to meet the demands of the property's intended use;

- failing to warn the Venegas family of the stalled truck;

- placing profits over safety;

- failing to read, promulgate, and follow public safe policies and procedures;

- and promulgating an access point and delivery plan for third parties that was unworkable and unsafe.

41. Defendants had actual knowledge of the dangerous conditions described above that caused injury to Plaintiffs. Each of these acts and omissions, singularly or in combination with others, constitute negligence on the part of the Defendants, which was the direct and proximate cause of this incident and the injuries sustained by Plaintiffs. Defendants' actions were knowing, reckless, and willfully indifferent or malicious. Plaintiff thus seeks punitive damages.

**B. Respondeat Superior/Agency**

42. Plaintiff incorporates the above paragraphs as if set forth in full below.

43. At all times, Defendants' employees and SOS Security personnel were agents and/or servants on behalf of Defendants. These Defendants exercised control over their employees and security guards, and at all relevant times, Defendants' employees, security personnel, and SOS Security personnel were operating within the scope of their employment for Defendants.

44. As such, these Defendants are responsible for the conduct and damages caused by any conduct of their employees, agents, and servants that contributed to the damages sought in this suit.

## V.
## DAMAGES

45. As a direct and proximate result of the foregoing events, Ms. Venegas and her three minor children suffered damages in the past and, in reasonable probability, will continue to suffer

**EXHIBIT A**

damages in the future, including physical pain and suffering, loss of income, loss of mobility, loss of independence, mental anguish, loss of earning capacity, past, present, and future medical expenses, all for which Plaintiff seeks recovery herein. Plaintiff also seeks punitive damages.

46. This action is also brought pursuant to §§ 71.001-71.012 of the Texas Civil Practice and Remedies Code. Plaintiff brings an action for wrongful death of Mr. Venegas. Plaintiff, under the wrongful death statute, is entitled to recover damages for:

   a. <u>Pecuniary Loss</u>: Pecuniary loss resulting from the death of Mr. Venegas, including, but not limited to, the loss of advice and counsel, care, maintenance, support, services, and earning capacity, as well as the reasonable contributions of pecuniary value that Plaintiff would in reasonably probability have received from him had he lived.

   b. <u>Mental Anguish</u>: Mental anguish suffered as a result of the death of Mr. Venegas, including, but not limited to, the emotional pain, torment, and suffering that Plaintiff would in reasonably probability, experience from the death of a family member.

   c. <u>Los of Companionship and Society:</u> Loss resulting from Mr. Venegas's death, including, but not limited to, love, companionship, comfort, and society that Plaintiff and her family would in reasonable probability had experienced if Mr. Venegas had lived;

   d. <u>Loss of Inheritance:</u> The earnings, if any, of Mr. Venegas, in excess of the amount he would have used for the support of himself and his family, and in which reasonable probability would have been added to his estate and left to Plaintiff and her family at his natural death had he lived.

   e. <u>Medical, Death, and Funeral Expenses:</u> Actual damages, including, but not limited to, medical expenses, death expenses, and funeral expenses caused by Defendants' conduct.

47. The damages sought herein are the direct and/or proximate result of the foregoing events, and Plaintiff and her family have suffered damages in the past and, in reasonable probability, will continue to suffer damages in the future, all for which Plaintiff seeks recovery herein. Plaintiff seeks all wrongful death damages and survival damages allowed by Texas law. Plaintiff also seeks punitive damages, costs, pre-judgment and post-judgement interest.

**EXHIBIT A**

## VI.
## DEMAND FOR JURY TRIAL

48.     Plaintiff demands a jury trial and has already tendered the appropriate fee.

## VII.
## CONDITIONS PRECEDENT

49.     All conditions precedent to Plaintiff, her husband's estate, and her children's right to recover have been fully performed, or have been waived by Defendants.

## PRAYER

50.     Plaintiff prays for judgment against Defendants in the amount of ten million dollars ($10,000,000) for actual damages for pecuniary losses, mental anguish, loss of companionship and society, loss of inheritance, pain and mental anguish, medical expenses, and funeral expenses; ten million dollars ($10,000,000) in exemplary damages; pre- and post-judgment interest as allowed by law; all costs of Court; and all other relief to which she may be justly entitled.

[Signature on Following Page]

## EXHIBIT A

Respectfully submitted,

**THE BUZBEE LAW FIRM**

By: /s/ *Anthony G. Buzbee*
Anthony G. Buzbee
Texas Bar No. 24001820
S.D. Tex. Bar No. 22679
tbuzbee@txattorneys.com
David L. Bergen
Texas Bar No. 24097371
S.D. Tex. Bar. No. 2858355
dbergen@txattorneys.com
Brittany C. Ifejika
Texas Bar No. 241110011
S.D. Tex. Bar No. 3651372
bifejika@txattorneys.com
J.P. Morgan Chase Tower
600 Travis, Suite 7300
Houston, Texas 77002
Telephone: (713) 223-5393
Facsimile: (713) 223-5909
www.txattorneys.com

**Attorneys For Plaintiff**
**Lucinne Venegas**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above was served by electronic-filing in compliance with the Federal Rules of Civil Procedure on or about October 29, 2021.

| | |
|---|---|
| Michelle D. Pector | David G. Oliveira |
| Texas Bar No. 24027726 | Tex. Bar No. 15254675 |
| S.D. Tex. Bar No. 28869 | doliveira@rofllp.com |
| Michelle.pector@morganlewis.com | Rene O. Oliveira |
| Jared Wilkerson | Tex. Bar No. 24099137 |
| Texas Bar No. 24084096 | roliveirajr@rofllp.com |
| S.D. Tex. Bar No. 2117319 | Roerig, Oliveira & Fisher, LLP |
| Jared.wilkerson@morganlewis.com | 10225 N. 10th Street |
| Morgan, Lewis & Bockius, LLP | McAllen, Texas 78504 |
| 1000 Louisiana, Suite 4000 | Tel: 956-393-6300 |
| Houston, Texas 77002 | Fax: 956-386-1625 |
| Tel: 713.890-5000 | |
| Fax: 713.890.5001 | **Attorneys For Defendants** |
| - And - | /s/ *David L. Bergen* |
| | David L. Bergen |

**EXHIBIT A**